The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, et al., Plaintiffs-Appellees,

v.

Michael LENNEN, et al., Defendants-Appellants,

UNION PACIFIC RAILROAD COMPANY, et al., Plaintiffs-Appellees,

v.

The DEPARTMENT OF REVENUE OF the STATE OF KANSAS, et al., Defendants-Appellants,

CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, et al., Plaintiffs-Appellees,

v.

Michael LENNEN, et al., Defendants-Appellants,

MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, Plaintiffs-Appellees,

v.

Michael LENNEN, et al., Defendants-Appellants,

BURLINGTON NORTHERN, INC., et al., Plaintiffs-Appellees,

v.

Philip W. MARTIN, et al., Defendants-Appellants.

Nos. 82–1873, 82–1878 and 82–1891.

United States Court of Appeals, Tenth Circuit.

April 27, 1984.

Carol B. Bonebrake, Atty., Dept. of Revenue, Topeka, Kan. (James J. McGannon of Regan & McGannon, Wichita, Kan., with her on the brief), for the state defendants-appellants/cross-appellees.

Robert J. O'Connor, Wichita, Kan. (Jeff A. Roth, of Hershberger, Patterson, Jones & Roth, Wichita, Kan., Donald J. Horttor and Grant M. Glenn of Cosgrove, Webb & Oman, Topeka, Kan., and Paul M. Buchanan, Asst. County Counselor, Wichita, Kan., with him on the brief), for the county defendants-appellants/cross-appellees.

Robert C. Foulston, Wichita, Kan. (Jay F. Fowler, Wichita, Kan., with him on the brief), of Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for plaintiffs-appellees/cross-appellants.

Before McKAY, LOGAN and SEYMOUR, Circuit Judges.

LOGAN, Circuit Judge.

This is an appeal from an order enjoining defendants Kansas Secretary of Revenue Michael Lennen, Director of Property Valuation of the Kansas Department of Revenue Philip Martin, and the Kansas Department of Revenue ("state defendants") from assessing the plaintiff railroads' property at more than 12.4% of true market value as the basis for 1980 property taxes. *Atchi-*

son, *Topeka and Santa Fe Railway v. Lennen,* 552 F.Supp. 1031 (D.Kan.1982). A number of Kansas county treasurers ("county defendants") intervened as defendants in this case, and they also appeal. Plaintiffs cross-appeal from an order dismissing their claims for restitution of alleged overpayment of property taxes for 1979.

All defendants contend on appeal that the district court erred (1) by allowing plaintiffs to prove the assessment ratio for "all other commercial and industrial property" by means of a study based on real property only; (2) by not giving proper weight to the assessment ratio for state-assessed property other than railroad property in determining the assessment ratio for "all other commercial and industrial property"; and (3) by admitting the official Kansas sales assessment ratio study into evidence. The county defendants argue that the district court should have ordered the Wichita railroads to pay 18% interest on their delinquent 1980 taxes. On cross-appeal plaintiffs argue that the district court erred in ruling that the railroads could not receive restitution for overpayment of 1979 taxes.

*The Statute*

In 1976 Congress enacted legislation prohibiting states from discriminating against rail transportation property in the assessment, levying, and collection of property taxes. Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, § 306, 90 Stat. 31, 54.[1] Section 306 was first codified at 49 U.S.C. § 26c. The language of § 306 was changed and recodified at 49 U.S.C. § 11503 as part of the Revised Interstate Commerce Act of 1978, 49 U.S.C. §§ 10101–11917. Because the revision was not intended to change the law, we must resolve any substantive conflicts between the original language of § 306 and the language in § 11503 in favor of the original language. *Atchison, Topeka and Santa Fe Railway v. Lennen,* 640 F.2d

255, 257–58 (10th Cir.1981). Because this appeal involves difficult questions of statutory construction, the original language of § 306 is important. That section provided:

"Part I of the Interstate Commerce Act (49 U.S.C. 1 et seq.), as amended by this Act, is further amended by inserting therein a new section 28, as follows:

'Sec. 28. (1) Notwithstanding the provisions of section 202(b), any action described in this subsection is declared to constitute an unreasonable and unjust discrimination against, and an undue burden on, interstate commerce. It is unlawful for a State, a political subdivision of a State, or a governmental entity or person acting on behalf of such State or subdivision to commit any of the following prohibited acts:

'(a) The assessment (but only to the extent of any portion based on excessive values as hereinafter described), for purposes of a property tax levied by any taxing district, of transportation property at a value which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the true market value of all such other commercial and industrial property.

'(b) The levy or collection of any tax on an assessment which is unlawful under subdivision (a).

'(c) The levy or collection of any ad valorem property tax on transportation property at a tax rate higher than the tax rate generally applicable to commercial and industrial property in the same assessment jurisdiction.

'(d) The imposition of any other tax which results in discriminatory treatment of a common carrier by railroad subject to this part.

---

1. The 94th Congress produced little legislative history concerning § 306. The bulk of the relevant legislative history comes from two earlier bills that were similar to § 306, S. 927, 90th

Cong., 1st Sess., 113 Cong.Rec. 2887 (1967) and S. 2289, 91st Cong., 1st Sess. 115 Cong.Rec. 14332 (1969). *See Clinchfield R.R. v. Lynch,* 700 F.2d 126, 128 n. 1 (4th Cir.1983).

'(2) Notwithstanding any provision of section 1341 of title 28, United States Code, or of the constitution or laws of any State, the district courts of the United States shall have jurisdiction, without regard to amount in controversy or citizenship of the parties, to grant such mandatory or prohibitive injunctive relief, interim equitable relief, and declaratory judgments as may be necessary to prevent, restrain, or terminate any acts in violation of this section, except that—

'(a) such jurisdiction shall not be exclusive of the jurisdiction which any Federal or State court may have in the absence of this subsection;

'(b) the provisions of this section shall not become effective until 3 years after the date of enactment of this section;

'(c) no relief may be granted under this section unless the ratio of assessed value to true market value, with respect to transportation property, exceeds by at least 5 per centum the ratio of assessed value to true market value, with respect to all other commercial and industrial property in the same assessment jurisdiction;

'(d) the burden of proof with respect to the determination of assessed value and true market value shall be that declared by the applicable State law; and

'(e) in the event that the ratio of the assessed value of all other commercial and industrial property in the assessment jurisdiction to the true market value of all such other commercial and industrial property cannot be established through the random-sampling method known as a sales assessment ratio study (conducted in accordance with statistical principles applicable to such studies) to the satisfaction of the court hearing the complaint that transportation property has been or is being assessed or taxed in contravention of the provisions of this section, then the court shall hold unlawful an assessment of such transportation property at a value which bears a higher ratio to the true market value of such transportation property than the assessed value of all other property in the assessment jurisdiction in which is included such taxing district and subject to a property tax levy bears to the true market value of all such other property, and the collection of any ad valorem property tax on such transportation property at a tax rate higher than the tax rate generally applicable to taxable property in the taxing district.

'(3) As used in this section, the term—

'(a) "assessment" means valuation for purposes of a property tax levied by any taxing district;

'(b) "assessment jurisdiction" means a geographical area, such as a State or a county, city, township, or special purpose district within such State which is a unit for purposes of determining the assessed value of property for ad valorem taxation;

'(c) "commercial and industrial property" or "all other commercial and industrial property" means all property, real or personal, other than transportation property and land used primarily for agricultural purposes or primarily for the purpose of growing timber, which is devoted to a commercial or industrial use and which is subject to a property tax levy; and

'(d) "transportation property" means transportation property, as defined in regulations of the Commission, which is owned or used by a common carrier by railroad subject to this part or which is owned by the National Railroad Passenger Corporation.'."

Railroad Revitalization and Regulatory Reform Act of 1976, P.L. No. 94–210, § 306, 90 Stat. 31, 54–55.

### Kansas Property Taxation

Kansas law requires that all property subject to a property tax be assessed at

30% of its fair market value. Kan.Stat. Ann. § 79–1439. Each year the Kansas director of property valuation appraises railroads and other public utilities on a unit basis. The director determines the total value of a particular public utility, including both real and personal property, and then determines the portion of that value that is to be assigned to Kansas and the portion of the Kansas value that is to be assigned to each county. County appraisers, rather than state appraisers, determine the value of other property in Kansas subject to property taxation. They appraise personal property each year, but they appraise real property less frequently because Kansas law prohibits countywide reappraisal of real property as the basis for levying taxes until the director of property valuation certifies reappraisal. Kan.Stat. Ann. § 79–1451. The last reappraisal of real property took place during the period from 1963 to 1971. The combined effect of infrequent reappraisal and inflation is that the ratio of assessed value of county-assessed real property to its true market value is almost always below 30 percent.

In 1980, of the commercial and industrial property base in Kansas, excluding railroads, 60% was locally-assessed personal property, 15% was locally-assessed real property, and 25% was state assessed.

*The Proceedings Below*

In June 1980 the Atchison, Topeka and Santa Fe Railway Company sued the state defendants under 49 U.S.C. § 11503, alleging that Kansas was discriminating against railroad property in the assessment and collection of property taxes.[2] The same day the Union Pacific Railroad Company and the St. Joseph and Grand Island Railway Company filed a similar complaint against the state defendants. Subsequently, two other railroads, the Chicago, Rock Island and Pacific Railroad Company and the Missouri-Kansas-Texas Railroad Company, each filed similar suits. We will refer to the plaintiffs in those four suits as "the Topeka railroads." In September 1980 seven other railroads[3] ("the Wichita railroads") filed a similar suit. In addition to their claim based on 1980 taxes, the Wichita railroads sought restitution of alleged overpayment of property taxes for 1979.

In November 1980 the district court denied the Topeka railroads' request for a preliminary injunction to restrain the State of Kansas from collecting the disputed taxes assessed against the Topeka railroads for the first half of 1980, which were due on December 20, 1980. The Topeka railroads took an emergency appeal to this Court, and this Court granted a temporary injunction pending the resolution of the appeal. Thereafter, the district court granted the Wichita railroads' request for a preliminary injunction pending the resolution of the Topeka railroads' appeal. The district court found that the entire amount levied against the Wichita railroads for the first half of 1980 was in dispute because the Wichita railroads sought to offset their alleged overpayments of 1979 taxes against their 1980 payments. Therefore, the district court allowed the Wichita railroads to pay the entire amount levied against them into the registry of the court, pursuant to Fed.R.Civ.P. 67.

Shortly thereafter this Court held that the district court should have granted the Topeka railroads' request for an injunction. *Atchison, Topeka and Santa Fe Railway v. Lennen*, 640 F.2d 255 (10th Cir.1981).

**2.** For a more detailed description of the early proceedings in this case, see *Atchison, Topeka and Santa Fe Ry. v. Lennen*, 531 F.Supp. 220 (D.Kan.1981).

**3.** The Wichita railroads are: the Burlington Northern, Inc.; the Chicago and Northwestern Transportation Co.; the Kansas City Southern Railway Co.; the Kansas and Missouri Railway and Terminal Co.; the Kansas City Terminal Railway Co.; the Missouri Pacific Railroad Co.; and the St. Louis-San Francisco Railway Co. On March 4, 1981, the parties stipulated that the Burlington Northern, Inc. should be substituted as the successor in interest to the St. Louis-San Francisco Railway Co.

Therefore, the preliminary injunctions remained in effect. The district court allowed the Topeka railroads to deposit the disputed taxes, 58% of the amounts levied against them, into the registry of the court.

The Topeka railroads then filed amended complaints, which added claims based on taxes they had paid in 1979, and all the railroads amended their complaints to name various county officials as defendants. Subsequently, all the cases were consolidated for further proceedings. After hearings the district court dismissed the Topeka and Wichita railroads' claims based on 1979 property taxes, and because the county defendants were named only in regard to the claims based on 1979 taxes, the district court dismissed the county defendants from the suit. The county defendants later reappeared as parties when the district court granted their motion to intervene. Thereafter, the district court ordered the clerk to distribute to the appropriate counties 40% of the Wichita railroads' deposit with the registry, which was the amount no longer in dispute, together with 40% of the interest that had accrued on the deposit.

At the trial, which took place in February 1982, the district court found for plaintiffs and enjoined defendants from assessing against or collecting from plaintiffs 1980 property taxes based on an assessment higher than 12.2% of true market value. 552 F.Supp. 1031. Subsequently, the district court amended the judgment to prohibit assessment at a level higher than 12.4%.

I

Defendants argue that the railroads failed to meet their burden of proof under

§ 306 because they did not offer evidence of the ratio of the assessed value of commercial and industrial *personal property* to its true market value. To evaluate that argument we must first determine what a plaintiff must show to establish a case under § 306.

Section 306(2)(d) provides: "[T]he burden of proof with respect to the determination of assessed value and true market value shall be that declared by the applicable State law." Under Kansas law the "burden of proving a disputed fact or issue rests upon the party asserting it as a basis of his claim." *Bowen v. Hathaway*, 202 Kan. 107, 446 P.2d 723, 727 (1968).[4]

Section 306(1)(a) prohibits

"[t]he assessment (but only to the extent of any portion based on excessive values as hereinafter described), for purposes of a property tax levied by any taxing district, of transportation property at a value which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the true market value of all such other commercial and industrial property."

Section 306(2)(c) provides for relief when the assessment ratio for railroad property exceeds the assessment ratio for other commercial and industrial property by 5%.

A plaintiff may easily determine the true market value of its railroad property[5] and its assessed value, which presumably will be 30% of its true market value. Its real burden is to prove the true market and assessed values of "all other commercial

---

**4.** The district court held that plaintiffs had to prove their case by clear and convincing evidence. The court cited *Northern Natural Gas Co. v. Williams*, 208 Kan. 407, 493 P.2d 568 (1972), in support of that holding. It is not clear to us why the district court held that the standard was clear and convincing evidence. Preponderance of the evidence is the usual standard under Kansas law. *See In re Wright's Estate*, 170 Kan. 600, 228 P.2d 911, 914 (1951).

**5.** In *Burlington Northern Railroad v. Lennen*, 715 F.2d 494 (10th Cir.1983), we held that Congress did not intend by enacting § 306 for the federal courts to become involved in challenges to the true market valuation figures arrived at by state officials for railroad properties unless the railroad could make a strong showing of purposeful overvaluation with discriminatory intent.

and industrial property." A plaintiff must then show that the ratio of assessed value to true market value of the railroad property is at least 5% greater than the ratio of assessed value to true market value for "all other commercial and industrial property."

The issue here is whether plaintiffs presented sufficient evidence to prove the ratio of the assessed value to true market value for "all other commercial and industrial property." Section 306(3)(c) defines "all other commercial and industrial property" as "all property, real or *personal,* other than transportation property and land used primarily for agricultural purposes or primarily for the purpose of growing timber, which is devoted to a commercial or industrial use and which is subject to a property tax levy." (Emphasis added.) To meet their burden of proof plaintiffs introduced the Kansas Real Estate Assessment/Sales Ratio Study for 1980, which was conducted pursuant to Kan.Stat. Ann. §§ 79–1435 to 1436b. The Kansas study examines the relationship between the assessed value and the sales price of *real property.* Plaintiffs also produced expert testimony interpreting the Kansas study. Dr. Frederick Ekeblad, one of the plaintiffs' expert witnesses, testified that the study showed that commercial and industrial real property in Kansas was assessed at 12.1% of its true market value. Plaintiffs offered no evidence of the assessment ratio for personal property in Kansas. Defendants introduced evidence showing that the assessment ratio for personal property was higher than the assessment ratio for real property and was probably close to 30% of true market value.[6]

The district court held that an assessment ratio derived from a study of real estate was prima facie proof of the assessment ratio for "all other commercial and industrial property" and therefore ruled that plaintiffs had established a prima facie case under § 306(1)(a). The district court adopted the reasoning of the district court in *Clinchfield Railroad v. Lynch,* 527 F.Supp. 784, 787 (E.D.N.C.1981), *aff'd on other grounds,* 700 F.2d 126 (4th Cir.1983), which interpreted § 306(2)(e) as an expression of congressional intent that the assessment ratio derived from a sales assessment ratio study of real estate should represent the assessment ratio for all other commercial and industrial property. Section 306(2)(e) provides:

"[I]n the event that the ratio of the assessed value of all other commercial and industrial property in the assessment jurisdiction to the true market value of all such other commercial and industrial property cannot be established through the random-sampling method known as a sales assessment ratio study (conducted in accordance with statistical principles applicable to such studies) to the satisfaction of the court hearing the complaint that transportation property has been or is being assessed or taxed in contravention of the provisions of this section, then the court shall hold unlawful an assessment of such transportation property at a value which bears a higher ratio to the true market value of such transportation property than the assessed value of all other property in the assessment jurisdiction in which is included such taxing district and subject to a property tax levy bears to the true market value of all such other property, and the collection of any ad valorem property tax on such transportation property at a tax rate higher than the tax rate generally appli-

---

**6.** Dr. Allison Manson, a professor of statistics at North Carolina State University, testified that he had conducted a sales assessment ratio study on personal property in Saline County, Kansas, and had determined that the median assessment ratio for commercial and industrial personal property was 26.83% of true market value. Also, eleven county appraisers testified and described the methods they used to assess personal property. Each county appraiser testified that he thought personal property in his county was appraised at 28 to 30% of true market value. The district court noted that defendants had introduced evidence "tending to show" that the assessment ratio for personal property "approached" 30%.

cable to taxable property in the taxing district."

Plaintiffs point out that § 306(2)(e) expresses a preference for the sales assessment ratio studies as a means of establishing discrimination. They argue that Congress was aware that a sales assessment ratio study is a study of real property and that Congress intended such real estate studies to be representative of the assessment ratio for "all other commercial and industrial property." Congress did so, plaintiffs argue, because of the difficulty of conducting sales assessment ratio studies of personal property.

We disagree. Although we recognize that § 306 is not a model of precision or clarity, we do not think Congress' inclusion of personal property in the definition of "all other commercial and industrial property" was purposeless or inadvertent. In a hearing on an earlier version of § 306, Senator Hansen of Wyoming questioned Philip Lanier, a railroad vice-president, about the fact that the proposed bill would permit a comparison of real property on one hand and real and personal property on the other. State Tax Discrimination Against Interstate Carrier Property: Hearing on S. 2289 Before the Subcomm. on Surface Transportation of the Senate Committee on Commerce, 91st Cong., 1st Sess. 43–45 (1969) (testimony of Philip Lanier, vice-president of the Louisville & Nashville Railroad Co.). Senator Hansen later introduced an amendment to S. 2289 that specifically included personal property in the definition of the type of property to which railroad property was to be compared. The Senate adopted the amendment. Cong.Rec. S2023 (daily ed. Jan. 30, 1970). All the successor bills to S. 2289 specifically included personal property in that definition. Plaintiffs' construction of § 306(2)(e) ignores Senator Hansen's amendment.

Although the legislative history shows that Congress knew that sales assessment ratio studies were normally conducted on real property only, plaintiffs cite nothing in the legislative history that suggests Congress assumed that sales assessment ratio studies could not be performed on personal property. In fact, Dr. Rolf Weil, an expert in public finance and an expert witness for plaintiffs at trial, told a senate subcommittee that sales assessment ratio studies could be conducted for personal property:

"It is by this technique that we can determine the level of assessments in a community. Normally State administrators as well as private industry, when they make such a study, limit the study to real estate. The reason for that is that it is a little more difficult to conduct such a study for personal property. It can be done for certain types of personal property, and invariably it would bring the ratio way down below the level you find by an analysis of real estate only."

State Tax Discrimination Against Interstate Carrier Property: Hearing on S. 2289 Before the Subcomm. on Surface Transportation of the Senate Committee on Commerce, 91st Cong., 1st Sess. 63 (1969) (statement of Rolf Weil, President, Roosevelt University). Although Dr. Weil's statement undermines plaintiffs' theory that Congress thought that sales assessment ratio studies could be conducted on real property only, his statement suggests an explanation of Congress' preference for a method of proof that is generally used for studies of real property despite the statute's inclusion of personal property in "all other commercial and industrial property." Congress may have assumed that Dr. Weil was correct in saying that the inclusion of personal property in a sales assessment ratio study would "invariably" lower the overall assessment ratio and also that Mr. Lanier was correct in telling a Senate committee that it was "universally true" that the assessment ratio for personal property would be lower than the assessment ratio for real property. State Tax Discrimination Against Interstate Carrier Property: Hearing on S. 2289 Before the Subcomm. on Surface Transportation of the Senate Committee on Commerce,

91st Cong., 1st Sess. 43–45 (1969) (testimony of Philip Lanier, vice-president of the Louisville & Nashville Railroad Co.). If Dr. Weil's contention were correct, then a plaintiff railroad would only hurt itself if it would not undertake the possibly arduous task of conducting a sales assessment ratio study for personal property. The Fourth Circuit drew the same conclusion in *Clinchfield:*

"There might be some merit in the district court's position insofar as Congress may have taken for granted that the railroads invariably suffer worse treatment with regard to their personal property than they do with respect to their realty. Where that is the case, the extension of the ratio found for real property to personal property as well works no injustice, at least to the taxing authority."

*Clinchfield Railroad v. Lynch,* 700 F.2d at 133 n. 11.

The evidence in this case clearly demonstrates that in Kansas the assessment ratio for personal property would not lower the overall assessment ratio. We do not think Congress intended railroads to enjoy a windfall in such a situation. We hold, therefore, that, on the facts in this case, the district court erred in allowing plaintiffs to prove the assessment ratio for all other commercial and industrial property by means of a study based on real estate only.[7]

Plaintiffs argue that if they cannot prove their case with a sales assessment ratio study of real estate, § 306(2)(e) requires a comparison of railroad property with all property that is subject to a property tax. They base that contention on their assertion that it is impossible to conduct a sales assessment ratio study of personal property. The assessment ratio for "all property," plaintiffs assert, would be as low as the assessment ratio for real property and defendants would gain nothing by prevailing on this issue. In response, we first note that plaintiffs have not shown that they cannot establish the assessment ratio for personal property by means of a sales assessment ratio study. Indeed, defendants' evidence suggested that such a study, although expensive, would be possible.[8] Also, although the legislative history does not reveal the purpose of § 306(2)(e)[9], we are certain that Congress did not intend to require defendants to forfeit the advantage of having residential, agricultural, and timber-producing real estate excluded from the assessment ratio if plaintiffs were required to prove the assessment ratio for personal property. Because Congress may not have contemplated a situation in which personal property assessment ratios were higher than real property assessment ratios, requiring plaintiffs to prove what those ratios are, Congress may never have considered the difficulty of conducting a sales assessment ratio study on personal property. Therefore,

7. We do not determine whether § 306 creates a presumption that the assessment ratio for personal property is lower than the assessment ratio for real property. Even if such a presumption exists, defendants produced enough evidence to overcome it. *See supra* note 6.

8. We doubt that such a study would be very costly in Kansas. Local appraisers assess personal property every year. They are required to use valuations in manuals provided to them by the state listing most standard items. Many valuations in the manuals—particularly vehicle valuations—are derived from national sales studies. Thus, for most personal property items the valuations in all counties will be the same, the figures are readily available from the state manuals, and many valuations may be easily

compared with existing national sales studies such as the N.A.D.A. Official Used Car Guide.

9. A possible explanation for § 306(2)(e) is that it discourages state governments from making real estate sales data inaccessible. If states make such data unavailable, then plaintiffs would have to prove the assessment ratio for all property subject to a property tax. This would eliminate the advantage states have by virtue of the exclusion of agricultural and timber-producing property from the definition of "all other commercial and industrial property," and from the exclusion of residential real estate, which is often assessed at ratios comparable to agricultural real property.

if the plaintiffs demonstrate on remand that preparing personal property sales assessment ratio studies would be prohibitively expensive, the trial court may permit plaintiffs and defendants to provide evidence on the level of assessment for personal property by less onerous forms of proof, such as appraisal studies and expert testimony.

The Fourth Circuit also concluded that § 306(2)(e) permits various types of proof to show the assessment ratio for personal property:

> "To the extent that the opinion of the district judge suggests that reliance should, under § 306(2)(e), be placed solely upon percentages derived from sales-assessment ratio studies of real estate to the exclusion of a similar inquiry into personal property by way of appraisal studies and expert testimony, we do not approve what the district judge had to say. The statute makes clear that personal property, as well as real estate, is to be dealt with in the course of achieving equality and thereby eliminating discrimination. We affirm the result reached in the district court on the quite different ground that the proof of the state failed as to the necessary data relevant to personal property."

*Clinchfield Railroad v. Lynch*, 700 F.2d at 133 (footnotes omitted).[10]

## II

Although neither party disputes the 30% assessment ratio for state-assessed non-railroad public utility property, defendants object to the method the district court used to factor that assessment ratio into the overall assessment ratio. The district court adopted Dr. Ekeblad's suggestion that the relevant assessment ratio would be the assessment ratio of the median parcel. Although Dr. Ekeblad testified that state-assessed property should not be considered at all, he suggested that the proper way to include such property would be to line up the 87,074 parcels of locally-assessed commercial and industrial real estate and the 239 "parcels" of public utility property, find the middle "parcel," and use the assessment ratio for that parcel as the proper assessment ratio for transportation property. Under this method the inclusion of non-railroad public utility property in the assessment ratio for "all other commercial and industrial property" changed the overall assessment ratio only from 12.1% to 12.2%, even though this property constituted 25% of Kansas' valuation base in 1980 for commercial and industrial property.

Defendants argue that the court should have used a "value weighted mean" to factor the assessment ratio for public utility property into the overall assessment ratio for "all other commercial and industrial property." That method would require the court first to figure the total assessed value of locally-assessed commercial and industrial real property, locally-assessed commercial and industrial personal property, and state-assessed public utility property; then to figure the total true market value of those three kinds of property; and finally to determine the ratio of the total assessed value to the total true market value.

■ We agree with defendants. A median has no significance if the items on the continuum are not alike in some relevant way. *See* International Association of Assessing Officers Assessment Standards Committee, Standard on Assessment Ratio Studies, § 3.10.3 (1980). "Parcel" as plaintiffs use it in this case is not a unit of measurement. In plaintiffs' calculations a small farm and an entire public utility each are one "parcel." The median "parcel"

---

**10.** The court in *Clinchfield* held that the defendants had the burden of proving the assessment ratio for personal property. That holding was based on the burden of proof under North Carolina law. In North Carolina a showing of an "inequitable difference" rebuts the assumption that an appraisal is correct. The court found that the sales assessment ratio study of real estate that the plaintiffs introduced showed an "inequitable difference." 700 F.2d at 131–32.

seems an even more inappropriate measure in a case such as this where all "parcels" of personal property would also have to be included in the assessment ratio for "all other commercial and industrial property." When, as here, categories of property that are subject to different methods of appraisal must be factored together to produce the assessment ratio for "all other commercial and industrial property," each category should be factored in proportion to its share of the total true market value of all such property. *Cf. AFC Industries, Inc. v. Arizona,* 714 F.2d 93, 95 (9th Cir.1983).

### III

Defendants' third argument is that the district court erred by admitting the Kansas Assessment/Sales Ratio Study into evidence. Kansas law prohibits the introduction of the study "in actions involving the assessment of property, sales of which are not required to be reported by county assessors to the director of property valuation under the provisions of K.S.A. 79–1436." Kan.Stat.Ann. § 79–1437b. Defendants also assert that the Kansas sales assessment ratio study is hearsay. However, Kansas evidentiary rules are not applicable in this case. Congress expressed a preference for the sales assessment ratio study as a means of proof, knowing that such a study contains hearsay. Also, the study meets the requirements of the residual exception to the hearsay rule: The statement is offered as evidence of a material fact; the statement is more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts; and the general purposes of the rules of evidence and the interests of justice will be served by admission of the statement. Fed.R. Evid. 803(24).

Defendants also argue that the Kansas study is unreliable. We do not think that the district court erred in finding that the Kansas study was reliable proof of the assessment ratio for real estate.

Taking a final stab at the Kansas study, defendants argue that it was inadmissible because it was not a random sample. The Kansas study included all sales of real estate in Kansas. A random sample of data is helpful only because it accurately depicts the universe of relevant data. The statutory requirement of a random sample is obviously intended to prohibit a selectively skewed sample, not to prohibit a comprehensive study.

### IV

The county defendants argue that the district court erred by not ordering the Wichita railroads to pay interest on their delinquent 1980 taxes at the Kansas statutory rate of 18%. *See* Kan.Stat.Ann. § 79–2968. On December 16, 1980, the district court temporarily enjoined defendants from collecting any portion of the property taxes that had been levied against the Wichita railroads for the first half of 1980 and enjoined the county treasurers from penalizing the Wichita railroads for their failure to pay any of the taxes deposited with the court. The court found that all of those taxes were in dispute because the Wichita railroads claimed an offset against their 1980 taxes because of overpayment of their 1979 taxes. On December 20, 1980, the day Kansas property taxes for the first half of 1980 became due, the Wichita railroads deposited the entire $2,504,318.67 with the court pursuant to Fed.R.Civ.P. 67. The district court later dismissed the railroads' claims for restitution of overpayment of 1979 taxes. Because 60% of the 1980 assessment was still in dispute, the clerk distributed to the counties 40% of the Wichita railroads' deposit plus 40% of the interest that had accrued on that deposit.

The counties argue that they are entitled to the difference between the interest they received and the interest they would have received at the 18% statutory rate. They also contend that the Wichita railroads' delinquent payment of their taxes for the first half of 1980 accelerated the due date

for payment of their taxes for the second half of 1980. Because the Wichita railroads paid the counties 40% of the taxes assessed for the second half of 1980 close to the regular due date in June 1981, rather than in December 1980, the counties argue that those railroads owe 18% interest on the taxes for the second half of 1980.

In *Atchison, Topeka and Santa Fe Railway v. Lennen,* 640 F.2d 255, 261 (10th Cir.1981), we held that a court considering whether an injunction should be granted under § 11503(c) must determine whether there is reasonable cause to believe that a violation of § 11503(b) has occurred or is about to occur. After our decision the preliminary injunction granted the Wichita railroads continued in effect. Defendants did not challenge the district court's implicit determination that reasonable cause existed to support continuation of that injunction.

■ The Wichita railroads did not ultimately prevail before the district court on their claim for restitution of taxes paid in 1979. However, the district court still had the power under § 306 to enjoin collection of the disputed taxes. To allow states to penalize taxpayers for delinquent payment of taxes, when the court has enjoined such payment, would frustrate the purposes of § 306. "[A]ny state law that frustrates or conflicts with the lawful objective of a federal statute must yield to the federal authority." *United States v. Composite State Board of Medical Examiners,* 656 F.2d 131, 135 n. 4 (5th Cir.1981); *see, e.g., Sperry v. Florida ex rel. Florida Bar,* 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963). The district court properly dismissed the counties' claims for interest.

## V

In their cross-appeal plaintiff railroads argue that the district court improperly dismissed their claim for partial refunds of taxes paid in 1979. The district court concluded that the plain language of § 306

expressly limits relief to prospective relief. Section 306(2) provides:

> "the district courts of the United States shall have jurisdiction, without regard to amount in controversy or citizenship of the parties, to grant such mandatory or prohibitive injunctive relief, interim equitable relief, and declaratory judgments as may be necessary *to prevent, restrain or terminate* any acts in violation of this section."

(Emphasis added.)

Although the district court's interpretation of that language is sensible, we think several Supreme Court decisions require us to inquire further before determining what forms of relief are available under § 306. *See Porter v. Warner Holding Co.,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Mitchell v. DeMario Jewelry, Inc.,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960); *see also ICC v. B & T Transportation Co.,* 613 F.2d 1182 (1st Cir.1980). In *Porter* the Supreme Court held that restitution of rent was available under the Emergency Price Control Act of 1942 even though the Act expressly authorized only "a permanent or temporary injunction, restraining order or other order." The provision in the Emergency Price Control Act for any "other order" might be considered an important distinction between that act and section 306 were it not for the Supreme Court's decision in *Mitchell v. DeMario Jewelry, Inc.* In *DeMario* the Supreme Court held that restitution of lost wages was available under the Fair Labor Standards Act even though the express grant of jurisdiction in the FLSA was "to *restrain* violations of section 15." (Emphasis added.) To support its holding the Supreme Court cited the following language from *Porter:*

> "Thus the Administrator invoked the jurisdiction of the District Court to enjoin acts and practices made illegal by the Act and to enforce compliance with the Act. Such a jurisdiction is an equitable one. Unless otherwise provided by stat-

ute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.... [T]he court may go beyond the matters immediately underlying its equitable jurisdiction ... and give whatever other relief may be necessary under the circumstances....

"Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."

361 U.S. at 291, 80 S.Ct. at 334–35 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–98, 66 S.Ct. 1086, 1088–89, 90 L.Ed. 1332 (1946)). The *DeMario* Court concluded:

"When Congress entrusts to any equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes. As this Court long ago recognized, 'there is inherent in the Courts of Equity a jurisdiction to ... give effect to the policy of the legislature. *Clark v. Smith*, 13 Pet. 195, 203 [10 L.Ed. 123].' "

361 U.S. at 291–92, 80 S.Ct. at 334–35.

 Because the Supreme Court would not infer a restriction on courts' power to grant restitution from Congress' grant of power under the FLSA to "restrain violations," we are unwilling to infer such a restriction from the language of § 306(2). Rather, as *DeMario* directs, we must determine whether restitution is necessary to effectuate the policy of § 306.

Congress enacted § 306 to help railroads escape discriminatory state property taxation. To allow states time to make corrections, Congress made § 306 effective on February 5, 1979, three years after its enactment. Those three years also gave the railroads time to marshall their forces and to prepare for litigation under § 306. Plaintiffs paid their 1979 Kansas property taxes without protest and did not file suit under § 306 until 1980. Nothing in plaintiffs' brief explains why they did not file suit until 1980.[11] No doubt the local taxing authorities promptly spent the money collected from the railroads, pursuant to budgeting decisions already made. Plaintiffs present no equitable basis for their claims for restitution.

We hold that the district court correctly held that restitution was not necessary to further the policy of § 306. Thus, the dismissal of plaintiffs' claims based on 1979 taxes was proper.

AFFIRMED IN PART; REVERSED IN PART.

---

11. We do not determine whether § 306 applied to 1979 Kansas property taxes. *See Alabama Great Southern R.R. v. Eagerton,* 472 F.Supp. 60 (D.Ala.1979).