MHC, INC., an Oregon corporation; PLM International, Inc., a Delaware corporation; Celtran, Inc., a Delaware corporation, Plaintiffs–Appellants,

v.

OREGON DEPARTMENT OF REVENUE; Richard A. Munn, Director of the Dept. of Revenue of the State of Oregon, Defendants–Appellees.

ACF INDUSTRIES, INC.; General American Transportation Corporation; General Electric Railcar Services Corporation; Pullman Leasing Company; Railbox Company; Railgon Company; Trailer Train Company; Union Tank Car Company, Plaintiffs–Appellants,

v.

OREGON DEPARTMENT OF REVENUE; Richard A. Munn, Director of the Dept. of Revenue of the State of Oregon, Defendants–Appellees.

BURLINGTON NORTHERN RAILROAD COMPANY; Portland Terminal Railroad Company, Plaintiffs–Appellants,

v.

OREGON DEPT. OF REVENUE; Richard A. Munn, Director of the Dept. of Revenue of the State of Oregon, Defendants–Appellees.

Nos. 94–35939, 94–35941 and 94–36238.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 1995.

Decided Sept. 29, 1995.

Richard A. Hayden, Bogle & Gates, Portland, OR, Terrence J. Benshoof, Kanter & Mattensen, Chicago, IL for plaintiffs-appellants MHC, Inc. and PLM International, Inc.

James W. McBride, Baker, Donelson, Bearman & Caldwell, Washington, DC, Stephen D. Goodwin, Baker, Donelson, Bearman & Caldwell, Memphis, TN, David L. Canary, Garvey, Schubert & Barer, Portland, OR, for plaintiffs-appellants Burlington Northern Railroad Company and Portland Terminal Railroad Company.

James W. McBride, Baker, Donelson, Bearman & Caldwell, Washington, DC, Stephen D. Goodwin, Baker, Donelson, Bearman & Caldwell, Memphis, TN, Gregory J. Miner, Bogle & Gates, Portland, OR, for plaintiffs-appellants ACF Industries Inc., General American Transportation Corp., General Electric Railcar Services Corp., Pullman Leasing Company, Railbox Company, Railgon Company, Trailer Train Company, and Union Tank Car Company.

James W. McBride argued for all plaintiffs-appellants.

Robert B. Rocklin (argued), Assistant Attorney General, Marilyn J. Harbur, Assistant Attorney General, Salem, OR, for defendants-appellees.

Before: CANBY, REINHARDT, and LEAVY *, Circuit Judges.

REINHARDT, Circuit Judge:

These cases arise out of prior litigation brought by various railroads challenging provisions of the Oregon property tax scheme under the Railroad Revitalization and Regulatory Reform Act. Pending the outcome of the primary litigation, the disputed taxes were placed into escrow accounts pursuant to a consent order entered upon stipulation of the parties. Eventually, Oregon prevailed on the merits. The present dispute centers on whether the railroads must pay the Oregon statutory rate of interest of 16% applicable to untimely paid taxes.

I.

Plaintiffs in these consolidated cases consist of various railroad and carline companies (hereinafter "railroads").[1] This dispute arises out of lawsuits filed by the railroads under § 306 of the Railroad Revitalization and Regulatory Reform Act, 49 U.S.C. § 11503 ("4–R Act"), seeking to enjoin collection of allegedly discriminatory *ad valorem* property taxes. These challenges began in the mid-eighties and stretched over a long period of years. New suits were filed for each successive tax year on behalf of different railroads. Although only a small subset of the specific tax years is at issue in this appeal, numerous similar appeals have been stayed pending the resolution of this case.

The merits of the tax challenges were resolved by *Department of Revenue of Oregon v. ACF Industries*, —— U.S. ——, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994), and are not at issue in this appeal. Oregon won. It did so by persuading the Court to reverse our decision in favor of the railroads. *ACF Industries, Inc. v. Dep't of Revenue of Oregon*, 961 F.2d 813 (9th Cir.1992). The issue presented here—how much interest the railroads must pay—involves various stipulations and escrow account agreements entered into between Oregon and the railroads, and the court orders issued pursuant to those stipulations, as well as the provisions of Oregon statutory law. The parties entered into agreements that were intended to remain in

---

* Judge Tang was originally a member of this panel and heard argument in this case. He died prior to circulation of this opinion, and pursuant to General Order 3.2(g), Judge Leavy was drawn as a replacement. Judge Leavy was provided with a tape of the oral argument as well as the briefs and other materials received by the other members of the panel.

1. Carline companies provide rail cars to railroads. They are considered part of the railroad industry protected by § 306 of the 4–R Act. *See ACF Industries, Inc. v. California State Bd of Equalization*, 42 F.3d 1286 (9th Cir.1994).

effect pending the ultimate resolution of the substantive issues of the tax disputes. These agreements were then embodied in stipulated consent orders approved by the court. Although there were minor variations, the key elements were virtually identical. As taxes became due, plaintiff railroads were to pay them into an interest-bearing escrow account. In return, Oregon agreed to instruct its various counties and taxing authorities to refrain from attempting to take any collection action against the railroads or their property, and from treating the taxes as delinquent in any other respect. Money could not be withdrawn from the escrow accounts except by agreement of the parties or by court order.

The agreements were intentionally silent as to the issue of interest. In Oregon, unpaid taxes are subject to a statutory interest rate of 16%. During the negotiations of the agreements, Oregon took the position that if the state's tax assessments were found to be valid, then the railroads would be required to pay the statutory rate of interest. It proposed a stipulation to that effect.[2] In contrast, the railroads maintained that the stipulation should read that the tax authorities were entitled only to the interest the escrow account actually accrued. The parties essentially agreed to disagree on this issue, and to litigate it later. That they are now doing. On this appeal, we must decide which party, if either, was correct.

Subsequent to the Supreme Court's decision on the merits in favor of Oregon, the parties filed cross-motions for summary judgment with respect to the interest issue. The railroads urged that the funds in the escrow accounts including the accrued interest (less administrative fees and expenses) be disbursed to the Oregon counties, and that the court declare that the disbursements satisfy their tax liability and any additional liability for interest. Oregon did not challenge the proposed disbursement of the funds, but rather sought a declaration that the railroads were required to pay interest at the statutory rate of 16%. The district court denied the

Railroads' motion, granted Oregon's, directed that the funds be disbursed to the railroads and ordered the railroads to pay the unpaid taxes plus interest at the statutory rate.

The difference between the statutory interest rate (16%) and the interest accrued on the escrow account (approximately 4%) is significant and amounts to millions of dollars for each tax year.

## II.

The primary argument urged by the railroads against imposition of the statutory interest rate is that the stipulated consent orders functionally served as interim equitable relief, and that the granting of interim equitable relief under the 4–R Act necessarily serves to prevent the imposition of state penalties for unpaid taxes. They further argue that the 16% interest rate constitutes a penalty. Finally, the railroads contend that because the disputed funds were paid into a restricted account pursuant to agreement of the parties, the taxes should be treated as timely paid, thus relieving them of the obligation to pay any interest other than that earned by the escrowed funds.

In contrast, Oregon argues that the agreements at issue here are distinct from a 4–R Act preliminary injunction, and that even if a preliminary injunction had been issued, the railroads would still have been responsible for the statutory interest. It further asserts that payment of the disputed funds into the specified accounts is immaterial because the state did not have the use of the money.

There is a split of authority on the question whether a railroad which obtains interim equitable relief under the 4–R Act is relieved of the obligation to pay statutory interest or penalties, and it is an open question in our circuit. However, before addressing it, we must answer the threshold question whether the consent orders here are the equivalent of interim equitable relief.

**2.** It appears from documents entered into the record on appeal that Oregon successfully inserted this stipulation in an escrow agreement for a class action filed for the 1993 tax year. However, the class action is not one of the suits currently before us.

## A.

■ The 4–R Act prohibits the discriminatory taxation of railroads by state and local taxing authorities. Congress enacted this legislation to protect the financial stability of the railroad industry by shielding it from predatory acts of state and local tax assessors. *See Dep't of Revenue of Oregon v. ACF Industries,* — U.S. —, —, 114 S.Ct. 843, 846, 127 L.Ed.2d 165 (1994). Section 306 of the Act, codified at 49 U.S.C. § 11503, empowers the federal courts to take affirmative action to prevent the prohibited discrimination. See 49 U.S.C. § 11503(c). Thus, the provision allows the federal courts to grant interim and permanent injunctive relief against one special type of invidious state taxation. This grant of power is an express exception to the general rule barring federal courts from interfering with the collection of state taxes.

The railroads urge that the stipulated consent orders are simply convenient substitutes for the interim equitable relief traditionally granted under the 4–R Act, namely, preliminary injunctions. In support of their argument, they point to the historical context of this case. The provisions of the Oregon tax scheme at issue in the underlying dispute were first challenged in 1985 by Union Pacific Railroad. The early suits, for tax years 1985 and 1986, apparently resulted in the grant of interim equitable relief by the district court which was upheld by this court on appeal.[3] Subsequent to obtaining this initial relief, Union Pacific and Oregon entered into stipulated consent orders which are the precursors of the orders in this case.

The Union Pacific litigation became the primary model for subsequent tax challenges brought by other railroads. From about 1986 until the time of the 1994 Supreme Court decision, the following pattern developed: a railroad would file suit seeking relief from the allegedly discriminatory Oregon tax scheme and move for a preliminary injunction; prior to adjudication of the motion, the railroad and the Oregon Department of Revenue would negotiate a stipulated consent order directing that the disputed funds be paid into a specified restricted account (the court registry or an escrow account);[4] the Oregon Department of Revenue would then send letters to the individual counties instructing them to refrain from attempting to collect property taxes that came due.

Consistent with the litigating pattern outlined above, plaintiff ACF Industries originally moved for a preliminary injunction under the 4–R Act in federal district court, and then entered into a consent order providing for an escrow account. Subsequently, in the trial on the merits, the district court denied all relief to ACF. On appeal, we reversed. *See ACF,* 961 F.2d 813 (9th Cir.1992). We found that the tax scheme was discriminatory and remanded to the district court for entry of an injunction. We subsequently stayed our mandate pending a determination by the Supreme Court. The Supreme Court ruled in favor of Oregon, and injunctive relief was never actually entered.

The railroads argue that by the time the current batch of stipulated orders was entered, the railroads' ability to obtain formal interim injunctive relief was a foregone conclusion in light of the history of the Union Pacific litigation and this court's ruling in the ACF litigation. Thus, they argue that for all practical purposes these consent orders were simply more efficient substitutes for a fully litigated preliminary injunction and should be given the same operative effect as more formal forms of 4–R Act interim equitable relief.

■ Several factors persuade us to treat these consent orders in the same manner as 4–R Act preliminary injunctions. First, we agree that the railroads' likelihood of obtaining the requested preliminary injunctions was clearly quite high. The standard for granting a preliminary injunction under the 4–R Act is much more relaxed than the

---

3. See Excerpts of Record filed for ACF Industries, No. 94–35941 at pp. 112–116.

4. Originally, the consent orders directed that the money be paid into the court registry but after legislation made it more expensive to keep funds there, the money was transferred on motion of the parties to private escrow accounts, and all subsequent stipulated orders directed that the money be placed in private accounts in the first instance.

standard generally applicable to requests for injunctive relief. A railroad need not satisfy our usual tests, including the balancing of the equities, *see, e.g., Cassim v. Bowen,* 824 F.2d 791, 795 (9th Cir.1987), but rather must only show that there is "reasonable cause" to believe that a violation of the 4–R Act has been or is about to be committed. *See, e.g., Burlington Northern v. Dep't of Revenue of Washington,* 934 F.2d 1064, 1074 (9th Cir. 1991). The 1985 and 1986 Union Pacific litigation involved the same substantive legal challenges raised in the underlying case here, and that litigation resulted in a preliminary injunction that was upheld on appeal. Under the relaxed standard applicable in 4–R Act cases, there is no reason to believe that a railroad making the same challenge as Union Pacific to the same provisions of the Oregon statutory scheme would have met with any less success in obtaining a preliminary injunction. Moreover, to the extent that some of these challenges were brought *after* our 1992 ruling finding the Oregon scheme unlawful, we can conclusively presume that any railroad seeking a preliminary injunction on the basis of that ruling would be victorious. And indeed, two of the railroads presently before us did not seek relief until after that ill-fated decision.

Second, we agree that the stipulations and consent orders had the same practical effect as a preliminary injunction. We can see little difference between the respective obligation of the parties under a stipulated consent order and their respective obligations under a preliminary injunction. In the consent order Oregon agreed to "refrain from collecting or causing to be collected. any amount of taxes from the plaintiffs." This is precisely the restriction that would have been placed on the state under a preliminary injunction. Further, the railroads agreed to pay all disputed taxes into a restricted account prior to the date the taxes would otherwise be due. This type of condition is fre- quently imposed upon the grant of a preliminary injunction. *See, e.g. Squaxin Island Tribe v. Washington,* 781 F.2d 715 (9th Cir. 1986). Moreover, the "consent orders" were orders that were actually *issued* by the district court and had the same legal effect as any other court orders.[5] In other words, if either party had violated the terms of the consent order it would have been subject to all available enforcement powers of the court, including sanctions and contempt. In this respect too, the orders had the same force and effect as any preliminary injunction.

Finally, the state's representations to the court reinforce our conclusion that these consent orders should be treated like preliminary injunctions. After our 1992 *ACF* decision, one of the plaintiffs in this case, Burlington Northern, sought a temporary restraining order to prevent the state from certifying the tax rolls to the various counties—rolls which included the disputed amounts. The state responded that such an order was unnecessary because it was willing to enter into a consent order similar to the orders it had agreed to for the previous six years. On the basis of the state's representations, the court denied the railroad's request because it viewed the issuance of an injunction as redundant. Specifically, the court stated: "I don't see any problem as long as the State agrees to stay and hold in escrow the disputed funds. [ ... ] I'm not here just for fun. I mean, you all—Let's get serious about this now. If the State will agree that all the disputed funds, taxes, will be held in escrow, what's your problem?" It is clear that the district court assumed, on the basis of the State's representations, that injunctive relief was *unnecessary* because the consent orders had the identical effect.

Thus, we agree with the railroads that the consent orders should be given the same operative effect as preliminary injunctions

5. This characterization is consistent with Oregon's representations to its individual counties. Pursuant to the consent order, the state sent letters to each county instructing it to take no action against the railroads to collect the disputed taxes. Specifically, this letter stated: "By Order of the federal court, you must take no action to collect the carlines' disputed taxes. *No* *collection action* means that you must not designate the amounts paid into the special account through the federal court as delinquent, or in any other way render these amounts subject to collection. The amounts should be treated as paid, but held by the federal court." E.R. 107 (emphasis in original).

and that they constitute interim equitable relief under the 4–R Act.

### B.

Courts have disagreed as to whether a railroad which obtains interim equitable relief under § 306 of the 4–R Act, but subsequently loses its challenge on the merits, may be required to pay a penalty for untimely payment of the disputed taxes.[6] Although several courts have addressed some version of this question, only two of these decisions require discussion: *Southern Railway Co. v. Stair*, 801 F.Supp. 37 (W.D.Tenn.1992) (finding interest and penalties assessable) and *Atchison, Topeka & Santa Fe Railway Co. v. Lennen*, 732 F.2d 1495, 1505–06 (10th Cir. 1984) (finding penalties not assessable).[7]

In *Stair*, the plaintiff railroads filed a Rule 60(a) motion requesting that the court amend its judgment to prohibit Tennessee authorities from collecting penalties and attorneys' fees based on the unpaid taxes. In denying the motion, the court reasoned that the penalty was simply an incentive to pay the tax and that because a taxpayer could pay the tax and still litigate its propriety, no reason existed to prohibit the collection of the penalty even when the tax remained unpaid pursuant to an injunction. *Stair*, 801 F.Supp. at 51. However, in its analysis the court did not consider the 4–R Act. For this reason, we find *Stair* ultimately to be of little assistance.

In contrast, the Tenth Circuit expressly analyzed the penalty question in light of the 4–R Act. In *Lennen*, the disputed taxes

were paid into the court registry during the pendency of the litigation. After the first stage of the litigation was concluded adversely to the railroads, the court disbursed the portion of the court registry account no longer in dispute along with a proportionate share of the accrued interest. On appeal, the counties argued that they were entitled to the difference between the interest received and the 18% statutory interest rate. The Tenth Circuit rejected this claim, reasoning that "allow[ing] states to penalize taxpayers for delinquent payment of taxes, when the court has enjoined such payment, would frustrate the purposes of § 306." *Id.* at 1506.

Oregon attempts to distinguish *Lennen* on the ground that it involves statutory *penalties* rather than statutory *interest*. However, this is a mischaracterization of *Lennen*, a case which expressly addressed the issue of statutory interest.[8] In any event, the formal label applied to the assessment at issue— whether "penalties," "interest," or otherwise—is not dispositive. We must look to the substance behind the labels.

■ Oregon argues that its statutory interest is not a penalty because it simply provides a motivational incentive to taxpayers to submit their payments in a timely manner. There are, of course, two kinds of motivational incentives—positive and negative. Negative "motivational incentives" are sometimes referred to less euphemistically as "coercion." In the tax context, we see no difference between a negative incentive and a penalty. The fact is that, either way, if one

---

**6.** Some of these cases discuss "penalties" while others discuss "statutory interest" or both interest and penalties. As discussed *infra*, the difference between statutory interest and penalties is dependent on far more than labels.

**7.** Oregon points us to two other published district court decisions which we find unhelpful. The first, *CSX Transportation, Inc. v. Forst*, 777 F.Supp. 435, 441 (E.D.Va.1991), provides no explicit reasoning for its decision to allow assessment of penalties and interest. The second involves the same litigation and was issued after the railroads ultimately lost their challenge. *CSX Transportation, Inc. v. Forst*, 808 F.Supp. 517, 522 (E.D.Va.1992). The district court simply ordered payment of interest and penalties without any additional discussion.

The railroads direct us to an additional district court decision from the Middle District of Tennessee. However, this decision is unpublished, and generally unpublished dispositions are of little or no persuasive value. *Cf.* Ninth Circuit Rule 36–3. In any event, the railroads have in large part incorporated the reasoning of this decision in their arguments, and the decision itself adds nothing to our discussion.

**8.** While strenuously arguing that *Lennen* is inapposite because it involved "penalties," the state ignores the fact that what was at issue in *Lennen* was "statutory interest." Oregon also ignores the fact that, ironically, the case on which it relies, *Stair*, involved "penalties" expressly denominated as "penalties" and does not even mention "statutory interest."

fails to pay one's taxes in a timely manner, one is subject to a significant adverse financial consequence. The "motivational incentive" to which Oregon refers is thus nothing more than a penalty thinly disguised as excess "interest." At oral argument the state conceded that its statutory 16% interest rate substantially exceeds the rate which would compensate the counties for the loss of the use of tax funds during the specified period and that the rate is based on factors other than the state's desire to charge a fair, reasonable, or even profitable rate of interest. Because the excess interest assessed lacks a compensatory or economic purpose and is designed to compel specific behavior by threatening the actor with serious adverse consequences if he does not submit to the state's commands, we conclude that it is in truth a penalty that is imposed, regardless of the label that Oregon employs.

Oregon alternatively argues that we should decline to follow *Lennen* because it misconstrues the 4–R Act. Oregon argues that the purpose of § 306 of the Act is to stop discriminatory taxation of railroads by state taxing authorities. Because the statutory interest rate applies equally to all Oregon taxpayers who fail to pay their taxes to Oregon authorities in a timely manner, Oregon argues that application of the statute involves no discrimination, and thus falls outside the scope of § 306. This argument is deceptively simple but patently fallacious.

It is true that § 306 bars discrimination between railroads and like-situated taxpayers in the assessment of taxes. To the extent that railroads are in a similar position to other taxpayers, § 306 requires that these groups be treated similarly. However, under federal law, the railroads are not in all instances situated similarly to other state taxpayers. In some contexts, the 4–R Act singles them out and affords them special treatment.

 Generally, a taxpayer who disputes a state tax, even if his challenge rests on a federal right, may not seek an injunction restraining the collection of the tax pending resolution of his dispute. Rather, he must follow the prescribed state procedures for disputing the tax—usually paying first, then litigating; but sometimes refusing to pay with the knowledge that he will be liable for a penalty if the assessment is upheld. Railroads, however, are treated differently by virtue of § 306 of the 4–R Act. They may obtain an injunction against the collection of taxes, if there is reasonable cause to believe that the taxes are discriminatory.

When the issue is the *tax* itself, then, the inquiry is properly focused on whether the state action is discriminatory. However, when the question is whether a penalty may be assessed for *delayed payment* of taxes, totally different considerations are implicated. Because the railroads are privileged under § 306 to obtain an order preventing the state from collecting disputed taxes, their delay in making payments is different in kind from the delay of all other taxpayers. In short, while § 306 prohibits discriminatory tax *assessments*, it also provides for a significant difference in treatment with respect to the *collection* of disputed taxes. The real issue is not whether the railroads are being "discriminated" against within the meaning of § 306, but whether, the statutory difference in treatment regarding tax collection serves to preclude imposition of the penalties the state seeks to impose.

If railroads are subject to penalties for withholding disputed taxes pursuant to court orders permitting them to do so, then their exercise of their federal right to obtain interim equitable relief carries with it a substantial burden. The "incentive" to which the state refers is, in the case of the railroads, simply a method of seeking to persuade them to forego their statutory right. Because one of the purposes of § 306 of the 4–R Act is to *allow* railroads to *forestall* prompt payment of disputed taxes, while the purpose of the interest penalty is to *force prompt payment*, the two purposes would appear to conflict directly. This conflict alone would seem to be sufficient to bar assessment of punitive interest. *See Lennen*, 732 F.2d at 1505–06. However, we need not go that far in this case. Here, the railroads did not simply rest on their right to forestall payment of the taxes. Rather, they paid the disputed funds into escrow accounts pursuant to a court

order. Under these circumstances, we find the railroads arguments irrefutable.

Typically, a court will condition a § 306 grant of interim equitable relief upon payment by the railroads of the disputed taxes into the court registry or an escrow account. Where the railroads have complied with such a requirement, the subsequent assessment of punitive interest imposes an even greater burden on the exercise of their federal rights than does a penalty imposed in a case in which they are free to benefit from the use of the funds during the time the underlying dispute is being litigated. Were the state to prevail, the railroads would have been both deprived of the use of their funds for a significant period of time and subjected to a substantial economic penalty for placing their funds in escrow pursuant to a court order. Under such a regime, railroads would be strongly discouraged from availing themselves of the remedy afforded by the 4–R Act. We agree with the Tenth Circuit's determination in *Lennen,* that the result urged by the state "would frustrate the purposes of § 306." 732 F.2d at 1506. Accordingly, we hold that the railroads are not liable for interest at Oregon's 16% statutory rate.

### III.

█ Although we conclude that the railroads are not subject to the punitive statutory rate of interest, Oregon is certainly entitled to receive a compensatory rate of interest. For a significant period, the subdivisions of the state have been deprived of the tax receipts they were entitled to receive. The railroads assert that the Oregon counties can be compensated for this deprivation by an award of the interest that has actually accrued on the funds in the escrow accounts. However, it appears that the accrued interest fell well below market rates and would thus fail to be compensatory. *Cf. Western Pacific Fisheries v. S.S. President Grant,* 730 F.2d 1280, 1288–89 (9th Cir.1984) ("below market

rates do[ ] not fully compensate the prevailing party and [ ] tend[ ] to discourage prompt litigation because delay gives an economic benefit to the debtor."). Moreover, the result urged by the railroads would be contrary to the terms of the consent orders themselves. Under those orders, the railroads expressly bore *all* the risk of investment. For example, the Burlington Northern stipulation contained the following paragraph:

6. The plaintiffs shall retain all risk with respect to such investments, and the defendants have no such risk.

See E.R. at 34. One of the risks of investment is a poor level of return.

The railroads suggest alternatively that we employ the rate of interest typically used in assessing awards of prejudgment interest in federal court. This alternative is an appealing one. We have often stated that an award of prejudgment interest is intended to be purely compensatory. *See, e.g., Western Pacific Fisheries,* 730 F.2d at 1288. In determining what such a compensatory rate might be, we have said that the proper measure is the interest earned during the relevant time period on "short-term, risk-free obligations." *Id.* We have also determined that generally this rate will be equivalent to the rate imposed by statute on post-judgment interest in 28 U.S.C. § 1961—a rate measured by reference to 52–week U.S. Treasury bill rates.[9]

█ Although, as Oregon argues, a debt of unpaid taxes is not identical to a damage award, the general principles regarding compensation are equally applicable in both cases. In each case, the goal is to place the prevailing party in the same position in which it would have been had it not been deprived of the sum owed it but instead had benefitted from the full use of the money during the period of deprivation. Thus, although no specific interest statute is expressly applicable in this case, we conclude that, as in the case of prejudgment interest, the rate

9. This statutory provisions reads in pertinent part:

(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent

(as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment.

28 U.S.C. § 1961(a).

of interest identified in 28 U.S.C. § 1961 is the appropriate rate.[10]

In sum, we hold that the railroads must pay interest at the rates provided for by 28 U.S.C. § 1961, calculated from the date the taxes would have ordinarily been due.[11] Interest shall be computed daily from that date until the date they are actually paid to the State. We remand to the district court for the limited purpose of making the necessary interest calculations.

REVERSED and REMANDED.

---

10. In the prejudgment interest context, we assess the rate applicable for post-judgment interest unless the equities of the particular case require a different rate. *See Western Pacific Fisheries,* 730 F.2d at 1289. Although the railroads briefed the issue of employing 28 U.S.C. § 1961 as a measure of compensatory interest, Oregon has made no argument that the equities of this case render the rate inappropriate. Rather, the state has simply proffered the bare assertion that prejudgment interest is irrelevant to the issue of delin-

quent taxes. Because the state has pointed to no factors suggesting that the formula in 28 U.S.C. § 1961 would fail to fully compensate it, we have no reason not to apply the post-judgment interest rate.

11. This rate varied over the relevant time period from a low of 3.13% to a high of 9.51%. See E.R. 89–90.